**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MIGDAD MOHD SHAFIQ QADAN,

      Appellant,

v.                                  Case No: 8:17-cv-1796-T-36

FLORIDA PROPERTY GROUP
ASSOCIATES, INC.,

      Appellee.

_____/

## OPINION

This cause comes before the Court upon Migdad Mohd Shafiq Qadan's ("Appellant") Notice of Appeal (Doc. 1) of the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees (Doc. 13-2). In the Final Order on Motion to Compel Payment of Brokers' Fees, the Bankruptcy Court ordered Appellant to pay Florida Property Group Associates ("FPGA"), a broker, a $103,600.00 commission. Upon due consideration of the record, the parties' submissions, oral argument, and otherwise being fully advised in the premises, the Court concludes that the Final Order on Motion to Compel Payment of Brokers' Fees of the Bankruptcy Court should be affirmed.

## I.      BACKGROUND

This appeal stems from a commission due to a broker following the sale of a debtor's real property at a court auction pursuant to a bankruptcy proceeding. Doc. 13-1; Doc. 13-2. On August 22, 2016, Namal Enterprises, LLC ("Debtor") filed a Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11 of the United States Bankruptcy Code. Doc. 40-1. At the time of filing, Debtor owned and operated a hotel in Kissimmee, Florida. Doc. 40-2. The objective of

Debtor's bankruptcy case "was to effectuate a sale of its property and business using the protections offered by the Bankruptcy Code." Doc. 40, p. 8; Doc. 40-2.

On December 21, 2016, Debtor filed an Application to Employ FPGA as Real Estate Broker ("FPGA Application"), seeking the Bankruptcy Court's approval to authorize and employ FPGA "exclusively as the real estate agent broker for the purpose of negotiating a sale" of the hotel. Doc. 13-13; Doc. 30, pp. 8-9. Debtor proposed that "Broker [FPGA] shall receive a 4% real estate brokerage commission (the 'Fee') based upon the agreed purchase price for the sale of Debtor's property, subject to the approval and adjustments by the Court in accordance with 11 U.S.C. Section 330." Doc. 13-13; Doc. 30, p. 8. An unsigned listing agreement between Debtor and FPGA attached to the FPGA Application provided that "[f]or the sale or exchange of the [hotel], [Debtor] shall pay a commission to FPGA of four percent (4%) of the purchase price." Doc. 13-15, ¶ 5; Doc. 30, p. 8.

Also on December 21, 2016, Debtor filed a Motion for Entry of An Order Authorizing the Sale of Debtor's Property, Free and Clear of All Liens, Claims and Encumbrances. Doc. 30, p. 3; Doc. 13-17. That motion sought court authorization of a sale of Debtor's assets to Appellant for a purchase price of $2,600,000.00. Doc. 30, p. 8; Doc. 13-17, p. 4. A proposed sales contract between Debtor and Appellant provided that Debtor was to pay any commissions due from the sale proceeds. Doc. 30, pp. 3-4; Doc. 13-18, ¶ 19 ([Debtor] has retained the services of [FPGA] . . . . The commissions due under that agreement in the event this Contract closes shall be paid by [Debtor] from sales proceeds at closing disbursed directly to the brokers entitled to those commissions.").

Appellant retained Carlos J. Bonilla, Esq. ("Bonilla") and his law firm in late December 2016 to perform due diligence on the hotel and to assist with closing. Doc. 30, p. 9. Bonilla did

not file an appearance in the Bankruptcy Court. Doc. 40, p. 24; Doc. 44, p. 10. Debtor and Appellant worked with Bonilla who drafted and made multiple revisions to the sales contract. Doc. 30, pp. 9-10.[1] TD Bank, a creditor of Debtor, opposed the Motion for Entry of An Order Authorizing the Sale of Debtor's Property. Doc. 30, p. 9; Doc. 13-20. TD Bank also filed a limited objection to Debtor's employment of FPGA. Doc. 30, p. 9; Doc. 13-21.

On January 16, 2017, Debtor filed an Amended Motion for Entry of An Order to S[ell] Debtor's Property Assets and Potential Claims, Free and Clear of All Liens, Claims and Encumbrances ("Amended Motion to Sell"). Doc. 30, p. 10; Doc. 13-22. The Amended Motion to Sell sought the Bankruptcy Court's authorization to sell Debtor's assets to Appellant for a purchase price of $2,500,000.00. Doc. 30, p. 10; Doc. 13-22. In the Amended Motion to Sell, the Debtor further proposed that "a broker be retained so that the property can be marketed for the Debtor to receive higher and better offers." Doc. 13-22, p. 4. The sale contract attached to the Amended Motion to Sell provided that Debtor would pay the four percent commission due to FPGA at closing. Doc. 30, p. 10; Doc. 13-22, p. 15. Debtor also filed an Expedited Motion for Order Approving Bidding and Auction Procedures and Approving Sale Free and Clear of Interest and requested a hearing. Doc. 13-23. That motion identified Appellant as a potential stalking horse

---

[1] Counsel for Appellant submitted the Declaration of Bonilla, providing details of communications between Bonilla and Debtor's representatives, including oral and written conversations concerning details of the purchase of property. Doc. 29. The Bonilla Declaration was not part of the record before the Bankruptcy Court, and cannot properly be considered by this Court on appeal. *Garcia v. Am. Marine Corp.*, 432 F.2d 6, 8 (5th Cir. 1970) ("It is fundamental that facts not presented at trial may not be asserted on appeal. Any action on appeal can be properly based only on matters considered at trial; this court may not therefore, reverse a trial court on the basis of facts not in the record."); *In re Lewis*, 211 B.R. 970, 973 (N.D. Ala. 1997), *aff'd*, 137 F.3d 1280 (11th Cir. 1998) ("[O]n appeal the district court should not consider evidence that was not before the bankruptcy court during the original hearing."); *In re Novinda Corp.*, 585 B.R. 145, 153 (Bankr. App. 10th Cir. 2018) ("[A]ppellate courts should not review documents that were not before the trial court when the rulings at issue were made."). Accordingly, the Court will not consider the Bonilla Declaration filed in the District Court as part of its appellate review. However, the Court considers the Bonilla Declaration and Patrick Declaration that were filed in the Bankruptcy Court, as well as all other pertinent documents filed in the Bankruptcy Court, that are part of the record on appeal. Doc. 13-44; Doc. 13-45.

bidder,[2] and requested the Bankruptcy Court approve certain bidding procedures to govern competing bids at an auction. Doc. 13-23, pp. 3-4.

The Bankruptcy Court held a hearing on January 17, 2017. Doc. 13-25. Appellant was not present.[3] Doc. 30, p. 6; Doc. 13-25. At the hearing, Debtor's counsel informed the Bankruptcy Court that Debtor had identified a stalking horse bidder (Appellant), and informed the Court of the details of the contract between Debtor and Appellant. Doc. 13-25, pp. 6-8. Debtor's counsel further informed the Bankruptcy Court that Tranzon Driggers would act as auctioneer. Doc. 30, p. 11; Doc. 13-25, p. 7. The Bankruptcy Court advised that Debtor's counsel would need to file an application to employ Tranzon Driggers, as was done with FPGA. Doc. 13-25, p. 7. Toward the end of the hearing, the Bankruptcy Court and Debtor's counsel conferred further about the proper procedure for employing Tranzon Driggers and the Bankruptcy Court determined it would disapprove FPGA's application as moot and approve the (forthcoming) Tranzon Driggers application, which would include provisions dealing with FPGA's commission. Doc. 30, pp. 12-13; Doc. 13-25, pp. 31-32.

On February 28, 2017, the Bankruptcy Court entered a Corrected[4] Order Approving Sale of Substantially All of the Debtor's Assets. Doc. 13-31. That order authorized Debtor to conduct a sale of the property by auction on March 29, 2017 at the United States Bankruptcy Court and ordered the sale to be held in accordance with the procedures, terms, and conditions set forth in the Bankruptcy Court's Bidding Procedures Order. Doc. 13-31, p. 2. The order approving the sale

---

[2] "A 'stalking horse' bid is the first bid from a potential buyer on a bankrupt debtor's assets. The debtor solicits this bid to set the floor for the later competing bids of other potential purchasers, thereby preventing lowball offers." *In re New River Dry Dock, Inc.,* 497 Fed. Appx. 882, 884 n. 2 (11th Cir. 2012).

[3] Appellant alleges that Debtor's counsel mistakenly advised the Bankruptcy Court that "the broker for the bidder" was present in the courtroom for the hearing. Doc. 30, p. 11; Doc. 13-25, p. 5. Appellant also alleges Debtor's "counsel noticed and held a hearing in the [B]ankruptcy [C]ourt" and that the certificate of service "does not indicate any notice of the hearing was given to [Appellant] or its counsel, despite [Appellant's] agreement to be the stalking horse bidder. [Appellant], not knowing about the hearing, did not attend in person or through a representative." Doc. 30, p. 11.

[4] The order was corrected only as to Debtor's name. Doc. 13-31.

further provided: "[a]ll customary closing costs shall be paid at closing, which all include, but are not limited to, the following: a) Brokers' commissions in amounts to be determined pursuant to either the final sales contract or separate agreements among the brokers and relevant parties." Doc. 13-31, pp. 2-3.

Debtor filed an Agreed Application to Employ Tranzon Driggers as Real Estate Broker ("Tranzon Driggers Application"), seeking the Bankruptcy Court's approval to authorize and employ Tranzon Driggers "exclusively as real estate agent broker for the purpose of negotiating a sale" of the hotel. Doc. 40, pp. 8-9; Doc. 13-26, p. 2. The Bankruptcy Court entered an order approving the Tranzon Driggers Application, providing:

> 4. The Debtor shall pay compensation to Broker [Tranzon Driggers], based upon the agreed upon gross sale price for the sale of Property . . . as follows:
>
> > a. 2% [if the hotel sold for] $2 million or less;
> > b. 2.5% [if the hotel sold for more than] $2 million, but less than $2.5 million; and
> > c. 3% [if the hotel sold for] more than $2.5 million;
>
> 5. To the extent that the purchaser of [the hotel] is procured by [FPGA], as the Stalking Horse Bidder, then FPGA shall be entitled to a 4% commission and [Tranzon Driggers] shall be entitled to a 1.5% commission.  If the Stalking Horse Bidder makes additional bids after its initial Stalking Horse Bid, then the Stalking Horse shall pay FPGA the commission directly in addition to the purchase price.

Doc. 13-32, ¶¶ 4-5.[5]

On March 3, 2017, the Bankruptcy Court entered an Order Approving Bidding and Auction Procedures Relating to Sale of Substantially All of the Debtor's Property ("Bidding Procedures Order"). Doc 30, p. 17; Doc. 13-35. That order identified Appellant as the potential stalking horse

---

[5] The Bankruptcy Court ordered Debtor's attorney, Katie Hinton, to serve a copy of the order on interested parties and file a proof of service within three days. Appellant alleges that neither the Tranzon Driggers Application nor the Court's order approving the Tranzon Driggers Application was served on Appellant or Appellant's counsel. Doc. 30, p. 17. The proof of service filed with the Bankruptcy Court states the order was served in compliance with the local rules upon registered users of the CM/ECF system, the Debtor, and "the attached Local Rule 1007-2 Parties in Interest list via regular U.S. Mail." Doc. 13-34. Appellant is not listed on the Parties in Interest List. And, no counsel appeared for Appellant in the Bankruptcy Court until April 21, 2017.

bidder, identified Tranzon Driggers as the broker and auctioneer, and set forth the bidding and auction procedures. Doc. 13-35, p. 2. Under that order, "[a]ny winning bidder . . . shall be responsible for all closing and transactional costs." Doc. 13-35, p. 5. The order further provided, in part, that the "Stalking Horse bidder [Appellant] may bid in the live auction however all bids must be under the same terms and conditions as the Qualified Bidders." Doc. 30, p. 17; Doc. 13-35, p. 4. Days later, the Bankruptcy Court entered a Corrected Bidding Procedures Order "to clarify payment of closing costs as to the initial Stalking Horse Bid." Doc. 13-37, p. 1. The Corrected Bidding Procedures Order provided: "[a]ny winning bidder *except the initial stalking horse bid* . . . shall be responsible for all closing and transactional costs, including broker fees." Doc. 13-37, p. 6.

On March 23, 2017, Appellant executed an "as is" contract to purchase Debtor's property as the stalking horse bidder. Doc. 30, p. 19; Doc. 40, p. 11; Doc. 13-71, pp. 5-6; Doc. 13-72. Under a section for "Brokerage Commission", the contract provided "N/A". Doc. 13-72, p. 15. The contract also provided, in part, "[s]hould purchaser [Appellant] bid above its net stalking horse bid, because other bidders start to outbid purchaser [Appellant] as the stalking horse, then purchaser's [Appellant's] bid shall be subject to and comply with the auctioneer's contract which shall include the additional payment of costs and expenses to close, including brokerage fees and closing costs, as well as all other terms and conditions stated therein." Doc. 13-72, p. 6. Bonilla conversed with Tranzon Driggers hours before the live auction, and confirmed that Tranzon Driggers' fee would not be paid by Appellant. Doc. 13-45, p. 1.

On March 29, 2017, the Bankruptcy Court presided over a live auction of Debtor's property. Doc. 40, p. 11; Doc. 30, p. 19; Doc. 13-52. Tranzon Driggers announced to the bidders and the Bankruptcy Court that there were seven qualified bidders plus the stalking horse bidder

(Appellant). Doc. 13-52, p. 11. An announcement was also made that the registration package disclosed all the expenses and costs that would be attributed to the successful bidder. Doc. 30, p. 19; Doc. 13-52, p. 14. The bid package included a "Real Property Sales Disclosure" that provided:

> **Buyer acknowledges** that this instrument has been read and signed before any Contract for Purchase and Sale of Real Estate referred to herein has been signed. Buyer understands the real estate broker, **Tranzon DRIGGERS is working as agent for the seller** named above and will receive a commission from the seller on this sale.

Doc. 13-40, p. 7 (emphasis in original). Appellant's counsel, Brad Patrick ("Patrick"), obtained the bid package for Appellant.[6] Doc. 30, p. 19.

At the auction, Tranzon Driggers announced the initial stalking horse bid of $2.5 million and explained that the initial stalking horse bid did not propose to pay any closing costs. Doc. 40, p. 11; Doc. 13-52, pp. 15-16. It was further announced that all other bids, besides the initial stalking horse bid, would be subject to transactional and closing costs. Doc. 40, p. 11; Doc. 13-52, pp. 16-17. Because of this, it was announced, the "actual bid amount [of the initial stalking horse bid]— because any other bidder would be paying for transactional and closing costs—we estimate to be about 2.35 million." Doc. 13-52, p. 17. However, "if the stalking horse bidder [Appellant] decides to participate, it's on the same terms and conditions as everybody else." Doc. 40, pp. 11-12; Doc. 13-52, p. 19.

The bidding commenced, and Appellant (the stalking horse bidder), abandoned the initial stalking horse bid and joined the qualified bidders under those terms and conditions. Doc. 13-52, pp. 21-22. It was announced, "[t]he stalking horse [Appellant] is at 2.15 [million] under the same terms and conditions as the other one, now paying the closing costs." Doc. 13-52, p. 22. Ultimately, Appellant prevailed with an all cash bid amount of $2,590,000.00 Doc. 13-52, pp. 27-28; Doc. 30,

---

[6] Patrick did not file a notice of appearance in the Bankruptcy Court. Doc. 40, p. 24. Patrick was not admitted to practice in the Bankruptcy Court. Doc. 40, p. 24; Doc. 13-84, p. 22.

p. 16; Doc. 40, p. 12. After the auction, Patrick executed the Real Property Sales Disclosure form and additional contract documents on behalf of Appellant in the conference room adjacent to the Bankruptcy courtroom. Doc. 30, p. 16.

On April 12, 2017, the Bankruptcy Court signed a Final Order Approving Auction Sale Free and Clear of Interests. Doc. 40-6; Doc. 40, p. 13. That order authorized a sale of Debtor's property to the "successful bidder and stalking horse bidder, [Appellant,] for a total price of Two Million, Five Hundred, Ninety Thousand U.S. Dollars ($2,590,000.00) (the 'Purchase Price')." Doc. 40-6, p. 3. The order further provided that "[a]t the closing, [Appellant] shall pay all transactional costs and closing costs in addition to the Purchase Price." Doc. 40-6, p. 4.

On April 21, 2017, G. Wrede Kirkpatrick, Esq. ("Kirkpatrick") filed a notice of appearance in the Bankruptcy Court on behalf of Appellant and requested service of all papers and notices. Doc. 40, p. 25; Doc. 13-38.

The Bankruptcy Court scheduled a post confirmation status conference for hearing on May 10, 2017. Doc. 40-6, p. 4. Prior to the post confirmation status conference, however, a dispute arose regarding whether Appellant or Debtor was responsible for broker fees. *See* Doc. 13-71, p. 8. Upon cross-motions for clarification, the Bankruptcy Court entered an order on April 26, 2017 concluding:

> [Appellant] is responsible for the auctioneer's broker fee. The initial order approving Tranzon Driggers as the auctioneer provided that if [Appellant] was the winning bidder, then [FPGA] would be entitled to a 4% commission since it procured the buyer, and Tranzon Driggers would receive a 1.5% commission as its broker fee. Under the Court's bid procedures order, the winning bidder was responsible for the broker fees (and other closing costs) unless the winning bid was the initial stalking horse bid.
>
> Shortly before the auction, [Appellant] executed an amended purchase and sale agreement that expressly provided that [Appellant] would be responsible for the broker fees if it had to bid above its initial stalking horse bid, which it did. To be sure, the bid registration form (which was provided to [Appellant] before the

auction) and the sales disclosure form (provided to [Appellant] afterward) both
stated that the Debtor would be paying the broker fees. But the language in the bid
registration and sales disclosure forms cannot override the plain language of this
Court's bid procedures order.

Doc. 13-54, p. 2 (citations omitted).

After the Bankruptcy Court entered its April 26, 2017 order, Appellant and Debtor
proceeded to close. Doc. 30, p. 22. The Closing Statement was filed with the Bankruptcy Court,
showing the 1.5 percent auctioneer's fee as Appellant's cost pursuant to the Bankruptcy Court's
recent order. Doc. 30, p. 22; Doc. 13-57. No other commissions are provided on the Closing
Statement. Doc. 30, p. 23; Doc. 13-57.

On May 10, 2017, Kirkpatrick filed a motion to withdraw from the Bankruptcy case and
requested to stop receiving electronic notice. Doc. 13-61. The motion advised that it was filed
pursuant to the instructions of Appellant, and that Kirkpatrick no longer represented Appellant.
Doc. 13-61.

At the May 10, 2017 post confirmation status hearing, the Bankruptcy Court heard further
argument with respect to Tranzon Driggers' commission, as well as the four percent commission
purportedly owed from Appellant to FPGA. Doc. 30, p. 25; Doc. 40, p. 14; Doc. 13-84, pp. 30-33.
Patrick attended the hearing on behalf of Appellant, although he had not filed a notice of
appearance in the Bankruptcy Court. Doc. 13-84, pp. 22-23; 28-29.

At the hearing, TD Bank argued that Tranzon Driggers was owed three percent, rather than
1.5 percent, pursuant to the Court's approval of Tranzon Driggers' Employment Application. Doc.
30, p. 24; Doc. 13-58. Tranzon Driggers joined TD Bank's motion and sought an order from the
Bankruptcy Court that Debtor pay the remaining 1.5 percent owed to it. Doc. 13-59, p. 6 ("As
[Appellant] has already tendered a check to Tranzon [Driggers] for 1.5 [percent] equity and
fairness dictate the Debtor pay the remaining 1.5 [percent.] If not, the Debtor will have received a

windfall as it will have hired Tranzon [Driggers] and obtained the benefit of Tranzon [Driggers']
work without shouldering any of the cost."). Patrick argued at the hearing that ordering Appellant
to pay another 1.5 percent to Tranzon Driggers "doesn't seem . . . fair under the circumstances."
Doc. 13-84, pp. 30-31.

The Bankruptcy Court determined that Tranzon Driggers was entitled to a three percent
commission, rather than a 1.5 percent commission, pursuant to the Court's approval of the Tranzon
Driggers Application, and that Appellant was responsible for that commission. Doc. 13-84, p. 31.
The Bankruptcy Court stated: "It's my conclusion that there's no question but that Tranzon
Driggers was to receive a sliding scale amount. And once it went over 2.5 [million] that number's
3 percent [commission]. And under the governing orders, that would be paid by the buyer
[Appellant]." Doc. 13-84, pp. 30-31.

Debtor's counsel then raised the issue of who was responsible for FPGA's four percent
commission. Doc. 13-84, p. 32. The Bankruptcy Court stated, "[w]ell, then the order will just
require the buyer to make that payment, and I'll reserve jurisdiction to enforce that order." Doc.
13-84, p. 32.

Following the hearing, the Bankruptcy Court entered an order on May 17, 2017, clarifying
that Appellant was responsible for Tranzon Driggers' full three percent commission. Doc. 13-63;
Doc. 40, p. 14. Finding that Appellant had already paid 1.5 percent of the commission owed, the
Bankruptcy Court ordered Appellant to pay the remaining 1.5 percent to Tranzon Driggers. Doc.
13-63, p. 2. The Bankruptcy Court's order did not comment on the commission owed to FPGA.
Doc. 30, p. 20.

On June 1, 2017, Debtor filed a Motion to Compel Payment of Broker Fees, requesting the
Bankruptcy Court order Appellant to immediately pay the four percent commission owed to FPGA

and the remaining 1.5 percent owed to Tranzon Driggers. Doc. 13-65. Through counsel,[7] Appellant opposed the motion, arguing the record was ambiguous and conflicting, that all of the contract drafts between Debtor and Appellant had provided that Debtor would be paying FPGA's commission, that Appellant had never engaged FPGA as his broker, and that FPGA was never approved by the Bankruptcy Court as a broker. Doc. 30, pp. 26-27; Doc. 13-71; Doc. 13-87, p. 55. Appellant further argued, in part:

> [I]t is fundamentally unfair and unjust to require [Appellant] to pay 7% in commissions while any other potential successful bidder would be paying 2-3%. Commonly, in real estate transactions, when two brokers participate in a sale, they split the same commission between them and do not simply increase the commission by more than double. Here, because [Appellant] won the auction not by his Stalking Horse Bid but by outbidding the other qualified bidders over and above the Stalking Horse Bid amount, he should be considered just another qualified bidder and not be required to pay commissions more than twice that required of any other bidder. What is even more egregious is the fact that [Appellant] actually assisted the auction process and the resolution of these disputes regarding the sale of the hotel by coming into the process as the Stalking Horse Bidder. Rather than reward [Appellant] as the Stalking Horse, who put hard money deposits in before anyone, the Debtor now seeks to have the [Bankruptcy] Court punish him as the winning qualified bidder by making him pay more in commissions than anyone else who participated in the auction would have been required to pay.
>
> These attempts to saddle [Appellant] with 7% commission payouts rather than 3% required to be paid by all other bidders is unfair in light of the facts and circumstances. Because his winning bid was not the Stalking Horse Bid amount and deal, th[e] [Bankruptcy] Court should declare that [Appellant] is not a Stalking Horse, the transaction brokered by FPGA (Stalking Horse Bid) did not occur, and therefore [Appellant] is treated like any other qualified bidder.

Doc. 30, p. 26; Doc. 13-71, pp. 10-11. The Bankruptcy Court held a hearing on June 26, 2017, ultimately granting Debtor's Motion to Compel on the basis that the Bankruptcy Court's prior orders requiring Appellant to pay the three percent commission to Tranzon Driggers and four

---

[7] Kirkpatrick was re-retained by Appellant following the Debtor's Motion to Compel, and filed the Response in Opposition to the Motion to Compel on behalf of Appellant. Doc. 40, p. 26; Doc. 13-69; Doc. 13-71.

percent commission to FPGA were final orders that were not timely appealed by Appellant. Doc.

13-87. The Bankruptcy Court stated, in pertinent part:

> While [Appellant's] argument is logical and does cry out for an equitable solution, at the end of the day the remedy that would have been available would have been a motion for rehearing or a motion for an appeal from th[e] [Bankruptcy] Court's prior orders, specifically th[e] [Bankruptcy] Court's order on [the] motion for clarification . . . dated April 26th.
>
> In that, I lay out the background of the situation and include that the buyer would pay, in that motion, 1.5 percent commission to Tranzon Driggers. The motion – the order also provides that the initial order approving Tranzon Driggers as auctioneer provided that if [Appellant] was the winning bidder, then FPGA would be entitled to a 4 percent commission since it procured the buyer, and Tranzon [Driggers] would receive a 1.5 percent commission as its broker fee.
>
> Under the [Bankruptcy] Court's bid procedures order, the winning bidder was responsible for the brokers' fees and other closing costs unless the winning bidder was the initial stalking horse bidder.
>
> That order did contain an error, and that is I stated that Tranzon [Driggers] would be entitled to a 1.5 percent commission. There was subsequently a motion by TD Bank for clarification of that order, in which Tranzon Driggers joined.
>
> I had a hearing on that on May 10th and concluded that the motion was well-taken, and ordered that Tranzon [Driggers] would be entitled to a 3 percent commission based on the sale price of 2.590 million, and that the bidder, [Appellant,] was responsible for payment of that commission, and then I ordered that amount be paid.
>
> There were no appeals from those orders, except to the extent that I could construe the response to the motion to compel as being a motion for rehearing. It would, of course, be untimely under the Bankruptcy Rules. So no matter how well and articulate that counsel for [Appellant] states his position, I'm afraid I have to overrule it and I will grant the motion to compel.

Doc. 13-87, pp. 68-70. The Bankruptcy Court entered its Final Order on Motion to Compel

Payment of Brokers' Fees, granting Debtor's Motion to Compel and ordering Appellant to pay

four percent to FPGA and the remaining 1.5 percent to Tranzon Driggers. Doc. 13-2.[8]

---

[8] Thereafter, Tranzon Driggers was paid in full. Doc. 19. Appellant states Tranzon Driggers' fee is no longer an issue on appeal. Doc. 30, p. 6.

Appellant filed a notice of appeal in this Court on July 27, 2017, appealing the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees. Doc. 1. Appellant filed his Brief on November 13, 2017, Doc. 30, in which he seeks reversal of the Bankruptcy Court's Final Order and seeks remand for entry of an order providing that Appellant has paid in full all commissions due to be paid by him for acquisition of the Debtor's property. Doc. 30, p. 46.

FPGA filed a Response Brief on February 12, 2018. Doc. 40. On February 13, 2018, Debtor provided notice of its adoption of FPGA's Response Brief. Doc. 41. Appellant's Reply Brief followed on March 19, 2018.

Oral argument was held on July 10, 2018. Doc. 49. At oral argument, the parties referenced the Bankruptcy Court's prior acknowledgement that the circumstances may "cry out for an equitable solution." *See* Doc. 13-87, p. 68. Recognizing that the parties had not had the opportunity to mediate and attempt to craft an equitable solution of their own since this appeal was filed, the Court, therefore, referred the parties—Appellant, FPGA, and the Debtor—to mediation. Doc. 52. Subsequently, the Debtor was excused from participating in mediation. Doc. 56.  Appellant and FPGA attended mediation on August 15, 2018, but did not settle this dispute. Doc. 57.

## II.    STANDARD OF REVIEW

The district court functions as an appellate court in reviewing decisions of the Bankruptcy Court. *See In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the Bankruptcy Court are reviewed *de novo*, and findings of fact are reviewed for clear error. *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). Equitable determinations by the Bankruptcy Court are reviewed for an abuse of discretion. *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

- 13 -

mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (citations and quotation marks omitted). In reviewing for abuse of discretion, courts recognize that there are "a 'range of possible conclusions the trial judge may reach,' and 'must affirm unless [the reviewing court] find[s] that the . . . [trial] court has made a clear error of judgment, or has applied the wrong legal standard.'" *Id.* (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007)). The burden of showing clear error falls on the party seeking to overturn a Bankruptcy Court's finding. *See In re Caribbean K Line, Ltd.*, 288 B.R. 908, 911 (S.D. Fla. 2002).

## III. DISCUSSION

**1. Whether Appellant failed to timely appeal certain of the Bankruptcy Court's order(s) determining that Appellant was required to pay a four percent brokerage commission to FPGA, thereby waiving this Court's review of the issue of whether Appellant was responsible for paying the four percent commission pursuant to those order(s).**

Appellant seeks reversal of the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees and remand to the Bankruptcy Court "for entry of an order providing that [Appellant] has paid in full all commissions due to be paid by him for acquisition of the property." Doc. 30, p. 46. In support, Appellant relies on various "ambiguous" and "contradictory" orders of the Bankruptcy Court, including the order approving Tranzon Driggers Application and the Corrected Bidding Procedures Order. Doc. 30; Doc. 13-32; Doc. 13-37. Appellant argues those erroneous orders, which were not appealed from, "culminated in the entry of the . . . Final Order on Motion to Compel Payment of Broker[s'] Fees . . . from which this appeal was taken." Doc. 30, p. 7.

FPGA argues that because Appellant failed to timely appeal the Bankruptcy Court's previous orders directly (all of those relevant orders besides the Final Order on Motion to Compel

Payment of Brokers' Fees), this Court "lacks jurisdiction to revisit the issue of whether [Appellant] is *responsible* for paying FPGA's [four percent] broker commission." Doc. 40, p. 6 (emphasis in original). Rather, FPGA argues, the only question before this Court is whether the Bankruptcy Court abused its discretion by compelling Appellant to pay FPGA's four percent commission pursuant to the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees. Doc. 40, p. 6; Doc. 13-2.

In reply, Appellant argues it "has timely appealed the one and only order it received directing it to pay fees to FPGA." Doc. 44, p. 8. Appellant contends it received no notice or opportunity to be heard with respect to the Bankruptcy Court's other order(s) explicitly referring to the four percent commission due to FPGA, other than the Final Order on Motion to Compel Payment of Brokers' Fees. Doc. 44, p. 8. Thus, Appellant argues, it is appropriate for this Court to evaluate the "propriety of imposing the payment" of the four percent commission on Appellant.[9] Doc. 44, p. 8.

The Federal Rules of Bankruptcy Procedure provide that a notice of appeal must be filed within fourteen days of the entry of the order of judgment being appealed. Fed. R. Bankr. P. 8002 ("[A] notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."). Certain exceptions exist, however. Under Bankruptcy Rule 8002(d), a court may extend the time to file a notice of appeal upon a party's motion that is filed within fourteen days after the judgment is entered or within twenty-one days after that time, if the party shows excusable neglect. Fed. R. Bankr. P. 8002(d)(1). In addition, under Bankruptcy Rule 8002(b), "[c]ertain timely-filed postjudgment motions filed in the

---

[9] Appellant does not cite to any legal authority in support of its conclusion that it is jurisdictionally appropriate for the Court to consider the "propriety of imposing the payment" pursuant to the Bankruptcy Court's earlier final orders which were not timely appealed.

bankruptcy court toll the time for an appeal from a final judgment of a bankruptcy court to a district court." *In re Mike,* 796 F.2d 382, 383 (11th Cir. 1986) (holding a "timely motion for rehearing tolls the time for filing an appeal").

Here, Appellant only filed a notice of appeal with respect to the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees. Doc. 13-1, p. 1; Doc. 30, p. 6. Appellant did not seek to appeal any of the Bankruptcy Court's other earlier orders, did not seek an extension of time in which to do so, and did not allege that a timely-filed postjudgment motion tolled the time for appeal of the Bankruptcy Court's other orders. Because Appellant did not timely appeal the Bankruptcy Court's prior orders, only the Bankruptcy Court's Final Order of Motion to Compel Payment of Brokers' Fees is properly before this Court for appellate review.

> **2. Whether the Bankruptcy Court violated the procedural due process rights of Appellant, a buyer, by not providing notice or an opportunity to be heard with respect to the Bankruptcy Court's earlier order(s) requiring Appellant to pay a four percent commission and/or by failing to provide Appellant an adequate opportunity to be heard thereafter.**

Underlying Appellant's argument that the Court should review the Bankruptcy Court's earlier orders, which were not timely appealed, is Appellant's contention that his procedural due process rights were violated.

Appellant argues a constitutional violation occurred because he did not receive notice or an opportunity to be heard with respect to the Bankruptcy Court's order(s) providing that Appellant would be responsible for FPGA's four percent commission. Doc. 30, pp. 38-46. Appellant asserts that because he was not routinely served with copies of filings in the case, he did not have notice that "he was in jeopardy of being ordered by the [Bankruptcy Court] to pay FPGA's [broker] fees." Doc. 30, p. 40. Appellant further asserts that he also did not have actual knowledge that his property rights were in jeopardy because negotiations between Appellant and Debtor had "always"

reflected that Debtor was responsible for FPGA's broker fee. Doc. 30, pp. 40-41. Appellant also argues that the Bankruptcy Court's June 26, 2017 hearing on the Motion to Compel did not satisfy due process after the fact because "the [B]ankruptcy [C]ourt was operating under the understanding that its prior orders were binding and could not be changed." Doc. 30, p. 43.

FPGA responds that it was Appellant's failure to retain attorneys to appear in and properly monitor the bankruptcy case, not any due process violations, that resulted in the Bankruptcy Court's determinations and this appeal. Doc. 40, pp. 23-26. Appellant asserts in reply that "[t]o require . . . that a non-party bidder seeking to participate in a bankruptcy auction . . . hire a bankruptcy attorney to read every filing in a proceeding under the off chance that an issue which may infringe upon an unstated right is buried in that filing is simply beyond anything that can realistically be expected of a non-party." Doc. 44, p. 11.

Due process is rooted in the Fifth Amendment of the United States Constitution, which provides in pertinent part: "[n]o person shall . . . be deprived of life, liberty, or property without due process of law . . . ." U.S. Const. Amend. V. Procedural due process "concerns the notice necessary to provide a property owner an opportunity to contest the validity of an action to deprive him of his property and serves the purpose of preventing arbitrary or unfair deprivations." *In re Golden*, 16 B.R. 580, 582 (Bankr. S.D. Fla. 1981) (citing *Fuentes v. Shevin*, 407 U.S. 67, 92 (1972)). With respect to adequacy of notice, the Supreme Court has held that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (internal citations omitted).

The Bankruptcy Code itself requires "notice and a hearing" before certain actions may be taken in a bankruptcy proceeding. *E.g.* 11 U.S.C. § 363(b)(1). The Bankruptcy Code flexibly

defines "notice and a hearing" as "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances . . . ." 11 U.S.C. § 102(1)(A); *see In re Basil St. Partners, LLC,* 477 B.R. 856, 866 (Bankr. M.D. Fla. 2012) ("This definition informs of an underlying policy that certain bankruptcy cases, by necessity, must be handled expeditiously. It also provides flexibility in an atmosphere in which bankruptcy courts are often faced with urgent matters that require hearings to be scheduled on short notice."); *In re Bankwest Boulder Indus. Bank,* 82 B.R. 559, 561 (Bankr. Colo. 1988) ("There is indeed flexibility in the statutory definition.").

The Local Rules of the United States Bankruptcy Court for the Middle District of Florida ("Local Rules"), promulgated pursuant to the Federal Rules of Bankruptcy Procedure, supplement and complement the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, Bankr. L.R. 1001-1(a), and provide additional guidance concerning notice. They also describe the Court's Case Management/ Electronic Case Filing System ("CM/ECF"), the procedure by which the Court "maintains paperless court files and dockets." Bankr. L.R. 1001-2(a). When a document is filed with the Court, it is served upon registered users of the CM/ECF system, as well as the "Parties in Interest List" established by Local Rule 1007-2. *See* Doc. 13-34. Local Bankruptcy Rule 1007-2 provides that, with respect to Chapter 11 proceedings, "the Clerk shall maintain the list of creditors holding the 20 largest unsecured claims filed by the debtor pursuant to Fed. R. Bankr. P. 1007(d) and shall designate this list as the 'Local Rule 1007-2 Parties in Interest List' in CM/ECF." Bankr. L.R. 1007-2(b). The rule further provides that the "Clerk shall also add to this list the names and addresses of parties who have filed requests for notice pursuant to Rule 2002-1(d)," which provides that one who files a request for notice shall be placed on the Parties in Interest List. *Id.*; Bankr. L.R. 2002-1(d).

Appellant directs the Court to a number of cases in an effort to support his argument that he was denied procedural due process. All of the cases Appellant cites, however, deal with procedural due process in the context of the rights of creditors or guarantors. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (creditor's due process rights); *In re B.I.B. Co., Inc.*, 165 B.R. 293 (M.D. Fla. 1994) (creditors' due process rights); *In re General Dev. Corp.*, 165 B.R. 685 (S.D. Fla. 1994) (notice to surety); *Ford Business Forms, Inc. v. Sure Card, Inc.*, 180 B.R. 294 (S.D. Fla. 1994) (notice to creditor); *In re Golden*, 16 B.R. 580 (Bankr. S.D. Fla. 1981) (bank holding judicial lien). None of the cases cited by Appellant suggest what process is due to a buyer such as Appellant.

Indeed, the Court has located few cases that deal specifically with the rights of buyers or bidders at a bankruptcy sale. And, of those cases, most deal specifically with the set-aside of a sale to a higher bidder where the original bidder was not given notice of a sale.[10]

In *Zalevsky v. Steele*, a bankruptcy court set aside a judicial sale of a debtor's property to the high bidder after the original bidder came forward and informed the bankruptcy court that it was not given notice of the sale. 78 B.R. 100 (W.D. Pa. 1987). On appeal, the district court affirmed the bankruptcy court's set aside of the sale. *Id.* at 101. While acknowledging that the mandatory notice provisions of Bankruptcy Rule 2002(a) do not include notice to bidders, the district court found "it to be a matter of common sense that notice of a public auction sale be given to the proposed buyer" and that not to do so would be "unfair." *Id.* at 102. Accordingly, the district court found the bankruptcy court was correct in concluding that the original bidders were entitled to notice of the sale. *Id.*

---

[10] Appellant, the winning bidder, does not advocate for such a result—the set-aside of the sale—here.

In *In re Winstead*, the district court found a sale to a higher bidder could not stand where adequate notice of a hearing was not given to the initial bidder. 33 B.R. 408, 410 (M.D. N.C. 1983). In that case, the trustee filed an application in the bankruptcy court seeking approval of a private sale between the debtor and the initial bidder. *Id.* at 409. The bankruptcy court noticed the matter for hearing, and notice was provided to the creditors and the initial bidder. *Id.* The initial bidder did not attend the hearing. *Id.* At the scheduled hearing, the trustee requested approval to sell the property to another, higher bidder. *Id.* The bankruptcy court indicated its approval of the sale at the hearing and later entered an order approving the sale to the higher bidder. *Id.* The initial bidder appealed the bankruptcy court's order. *Id.* The district court found that approval of the sale to the higher bidder was inappropriate because the initial bidder did not have adequate notice that the scheduled hearing would include hearing concerning sale of the property to another bidder. *Id.*

Similarly, in *In re Northern Star Indus., Inc.*, the district court overturned a bankruptcy court's acceptance of a higher offer during a hearing where adequate notice was not provided to the initial bidder. 38 B.R. 1019 (E.D. N.Y. 1984). In that case, a trustee issued a notice to creditors of an intended sale which noted that a hearing on any objections would be held on November 17, 1983 at the bankruptcy court. *Id.* The trustee also issued a "Notice of Compromise with Secured Creditor" which set forth a proposed agreement between the trustee and a creditor. *Id.* at 1020. The notice provided that hearing on the proposed compromise would also be held on November 17, 1983. *Id.* No objections were filed to the proposed sale, but objections were filed to the proposed compromise. *Id.* The initial bidder did not attend the November 17 hearing on reliance that no objections had been filed to the proposed sale. *Id.* At the hearing, an attorney for another bidder announced his client was willing to make a higher offer. *Id.* The bankruptcy court accepted the

higher offer. *Id.* Overturning the bankruptcy court, the district court held it was inequitable to permit the higher bidder to make an offer for the property because the sole purpose of the hearing was to consider the proposed compromise. *Id.* at 1021. No objections to the sale had been filed; thus, no proceedings concerning the proposed sale should have taken place. *Id.*

A New York bankruptcy court reached a different result in *In re Vantage Petroleum Corp.*, declining to grant the original bidder's untimely motion to set aside the sale to a higher bidder based on the original bidder's lack of notice of a hearing. 55 B.R. 46 (Bankr. E.D. N.Y. 1985). In that case, the bankruptcy court placed the blame for the original bidder's failure to appear at a hearing on the original bidder's attorney who neither requested service of notices that related to the property nor made an appearance in the bankruptcy court. *Id.* at 48. The court provided:

> In liquidating property of a bankruptcy estate outside the regular course of business, the Bankruptcy Code and the Bankruptcy Rules require notice of sale and a hearing before the court. 11 U.S.C. § 363(b); Bankruptcy Rule 6004(a). The notice of sale for property such as the subject real estate must be served by the court (or served by others whom the court directs) upon (1) the debtor, (2) the trustee, (3) all creditors, and (4) others as the court may direct. Bankruptcy Rule 2002(a)(2).

> In this case, the court ordered the trustee to serve notices upon the debtor, the named creditors, and to publish notice for the public at large. Had Mr. Foley [the original bidder's attorney], on behalf of Terra Homes [the original bidder] requested service of notices that related to the subject property, the court would have been obliged to order the trustee to serve him as well. In fact, no notice of appearance was filed pursuant to Bankruptcy Rule 9010 nor was the court otherwise made aware of the existence of counsel for Terra Homes.

> Mr. Foley was wrong to rely on the trustee to provide him with informal notice. Unfortunately for Terra Homes, it is beyond the sound discretion of this court to correct Mr. Foley's mistake by rescinding approval of the sale to Mr. Weinberger, the ultimate purchaser.

*Id.* at 48. The *In re Vantage Petroleum* court distinguished the facts of that case from *Northern Star Indus., Inc.*, finding, among other things, that the original bidder failed to file a timely motion for amendment of judgment approving the sale. *Id.* at 47-48 ("Terra homes [the original bidder]

filed its affidavits and Order to Show Cause eight days beyond the deadline for a motion for amendment of judgment and the court must therefore deny the relief sought for procedural reasons alone.").

Critically, although the above-cited cases deal with the issue of notice, they do not specifically address due process under the United States Constitution. Rather, the key consideration appears to be equity. *See Zalevsky v. Steele*, 78 B.R. at 103-104; *In re Winstead*, 33 B.R. at 411 ("The court is mindful of the emphasis upon finality in judicial sales and the requirement that there be compelling equities in order to set aside confirmed sales. Such compelling equities are present in this case."); *In re Northern Star Indus., Inc.*, 38 B.R. at 1021-22; *In re Vantage Petroleum Corp.*, 55 B.R. at 48 ("[T]he importance of preserving public confidence in the finality of judicial sales, outweighs, in this instance, the equitable arguments put forth by [the losing party].").

Here, Appellant was not a person to whom notice was required to be given pursuant to the Bankruptcy Rules. Although Appellant had a means to receive service of all filings, he did not do what was necessary to ensure that occurred. Appellant could have had counsel make an appearance in the Bankruptcy Court. Alternatively, Appellant could have filed a request for notice in order to be added to the Parties in Interest List. Bankr. L.R. 1007-2(b); 2002-1(d). Appellant did not timely do either. As a consequence of these missteps, Appellant did not receive certain orders of the Bankruptcy Court that, as it turns out, would affect his stake in the process. Appellant was, however, given an opportunity to be heard as to Debtor's Motion to Compel Payment of Broker Fees. The record before this Court does not establish a violation of Appellant's procedural due process rights by the Bankruptcy Court.

**3. Whether the Bankruptcy Court abused its discretion by entering an order compelling Appellant to pay a four percent brokerage commission pursuant to the prior orders of the Bankruptcy Court without considering legal alternatives given the acknowledged inequities of the proceeding.**

The Court now reviews whether the Bankruptcy Court abused its discretion by ordering Appellant to pay FPGA's commission pursuant to the Final Order on Motion to Compel Payment of Brokers' Fees. Doc. 13-2.

"Orders implicating the equitable discretion of the bankruptcy court are reviewed for an abuse of discretion." *In re Murphy*, Bankr. No. 6:04-Bk-1612-KSJ, No. 6:08-cv-198-Orl-31, 2008 WL 2224835, at *2 (M.D. Fla. May 27, 2008). Bankruptcy court orders denying motions for reconsideration are also reviewed for abuse of discretion. *In re Woide v. Fed. Nat'l. Mortg. Ass'n.*, Bankr. No. 6:10–bk–22841–KSJ, No. 6:16–cv–1524–Orl–37, 2017 WL 477706, at *2 (M.D. Fla. Feb. 6, 2017). Moreover, a bankruptcy court's interpretation of its own order is "entitled to substantial deference" and is likewise reviewed for abuse of discretion. *In re FFS Data, Inc.*, 776 F.3d 1299, 1303 (11th Cir. 2015); *In re Optical Tech., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005) ("[T]he bankruptcy judge who has presided over a case from its inception is in the best position to clarify any apparent inconsistencies in the courts' rulings." (quotation marks omitted)). "In reviewing for abuse of discretion, [a court] recognize[s] the existence of a range of possible conclusions" a bankruptcy judge may reach and must affirm unless it finds that the lower court "has made a clear error of judgment, or has applied the wrong legal standard." *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008) (citations and quotation marks omitted).

"[A] bankruptcy court has wide latitude to reconsider and vacate its prior decisions, so long as the proceedings have not been terminated, and no intervening rights have become vested which would be disturbed by a modification or reconsideration of the court's decision." *Matter of Combined Metals Reduction Co.*, 557 F.2d 179, 200-01 (9th Cir. 1977) (citing *Pfister v. Northern*

*Illinois Finance Co.*, 317 U.S. 144 (1942)). The power of a bankruptcy court to set aside its own prior orders is based on Rule 60 of the Federal Rules of Civil Procedure, which are made applicable to bankruptcy proceedings by Bankruptcy Rule 9024. *In re Grossot,* 205 B.R. at 342.

Here, prior to making its determination that Appellant should be compelled to pay FPGA's four percent commission, the Bankruptcy Court took oral argument on the issue and reviewed its prior orders on the topic. Doc. 13-87, pp. 38-74. Finding that at least two of its prior orders placed the burden of FPGA's four percent commission on Appellant, the Bankruptcy Court entered the order compelling Appellant to pay FPGA, directly, the four percent commission based on those earlier orders. In doing so, the Bankruptcy Court noted the seemingly unfairness of the situation, including that it did "cry out for an equitable solution." Doc. 13-87, pp. 68, 72.

Upon thorough review of the record, the Court cannot conclude that the Bankruptcy Court's Final Order on Motion to Compel Payment of Brokers' Fees was incorrect. The Bankruptcy Court is entitled to substantial deference in interpreting its own orders. Here, the Bankruptcy Court reviewed its prior orders and determined that FPGA's commission was to be paid by Appellant. Indeed, certain orders of the Bankruptcy Court tasked Appellant with payment of FPGA's commission. The record does not establish that the Bankruptcy Court made a clear error of judgment or applied the wrong legal standard when it interpreted its prior orders.

Nor can the Court soundly determine that the Bankruptcy Court abused its discretion from an equitable standpoint. Appellant, the Bankruptcy Court, and now this Court, acknowledge confusion in the record and the predicament that befalls Appellant. Still, given that the sale of the hotel was completed and that the Bankruptcy Court's earlier orders were not timely appealed, it is unclear what feasible options the Bankruptcy Court had other than to enter an order compelling Appellant to pay FPGA's commission. Importantly, however, it is not within the province of this

Court to decide what it would have done in the first instance; what matters is whether the Bankruptcy Court abused its discretion. The Court holds it did not, and affirms the Bankruptcy Court.

## IV.    CONCLUSION

Appellant has not shown that the Bankruptcy Court made any error of law, made factual findings that are clearly erroneous, or abused its discretion in making equitable determinations. The Bankruptcy Court correctly applied the law to the facts.

Accordingly, it is hereby **ORDERED AND ADJUDGED:**

1.     The Final Order on Motion to Compel Payment of Brokers' Fees (Doc 13-2) entered on July 11, 2017, which ordered Appellant to pay to FPGA $103,600.00 is **AFFIRMED**.

2.     The Clerk is directed to close this case.

**DONE AND ORDERED** in Tampa, Florida on September 25, 2018.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any
Chief United States Bankruptcy Judge Michael G. Williamson